**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1629-19T1

ANNA JASICKI,

     Plaintiff-Appellant,

v.

MORGANSTANLEY
SMITHBARNEY LLC,
MORGAN STANLEY
WEALTH MANAGEMENT
d/b/a MORGAN STANLEY,
and JAMES LLOYD,

     Defendants-Respondents.

_____

Argued January 5, 2021 – Decided January 19, 2021

Before Judges Mawla and Natali.

On appeal from the Superior Court of New Jersey, Law Division, Monmouth County, Docket No. L-1686-19.

R. Armen McOmber argued the cause for appellant (McOmber McOmber & Luber, PC, attorneys; Matthew A. Luber and R. Armen McOmber, on the briefs).

Thomas A. Linthorst argued the cause for respondents (Morgan, Lewis & Bockius, LLP, attorneys for Morgan

Stanley Smith Barney, LLC, and Morgan Stanley Wealth Management; Hamburger Law Firm, LLC, attorneys for James Lloyd; Thomas A. Linthorst, Tova Katims, and Sharron E. Ash, on the joint brief).

PER CURIAM

Plaintiff Anna Jasicki appeals from a December 5, 2019 order dismissing her complaint against defendants Morgan Stanley Smith Barney, LLC, Morgan Stanley Wealth Management d/b/a Morgan Stanley, and James Lloyd, and compelling arbitration. We affirm.

Plaintiff was employed at Morgan Stanley beginning in 2011. In May 2019, she filed a three-count complaint in the Law Division alleging disparate treatment and hostile work environment, sexual harassment and discrimination, and retaliation pursuant to the New Jersey Law Against Discrimination, N.J.S.A. 10:5-1 to -49. The complaint alleged plaintiff's supervisor, Lloyd, had committed various acts of sexual harassment and when she rejected his advances, he retaliated against her. The complaint also alleged when plaintiff complained about Lloyd's conduct to Morgan Stanley, it protected Lloyd and retaliated against her.

Defendants moved to compel arbitration, alleging plaintiff waived her right to prosecute her claims in court because she agreed to arbitration. Specifically, defendants argued that on September 2, 2015 at 3:19 p.m., Morgan

Stanley's human resources email account sent an email to plaintiff's work email with the subject line, "Expansion of CARE[1] Arbitration Program."  The body of the email read:

Expansion of CARE Arbitration Program

September 2, 2015

More than [ten] years ago, Morgan Stanley launched CARE . . . the [f]irm's internal employee dispute resolution program.  CARE provides employees with a quick and neutral way to raise and address workplace concerns.  By combining internal (informal resolution) and external (mediation and arbitration) dispute resolution mechanisms, CARE promotes open and honest communication, increases mutual respect, and resolves employment-related concerns swiftly, fairly[,] and economically.

Current registered employees are required to arbitrate most workplace claims under existing FINRA [Financial Industry Regulatory Authority] rules, and given the success of the CARE program, Morgan Stanley is announcing the expansion of CARE and modifications to related [f]irm policies and programs to extend arbitration obligations for all U[.]S[.] employees – registered and non-registered.  Effective October 2, 2015, arbitration under the CARE Arbitration Program will be mandatory for all employees in the U.S., and all covered claims between the [f]irm and employees will be resolved through final and binding arbitration on a non-class, non-collective and non-representative action basis as more fully described in the Arbitration Agreement and CARE Guidebook.  Please review the

---

[1] CARE stands for Convenient Access to Resolutions for Employees.

A-1629-19T1

Arbitration Agreement and the CARE Guidebook. It is important that you read and understand the Arbitration Agreement and the CARE Guidebook as they describe the terms, features[,] and details of this program.

**Next Steps**

By continuing your employment with Morgan Stanley, you accept and agree to, and will be covered and bound by the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook, unless you elect to opt out of the CARE Arbitration Program by completing, signing and submitting an effective CARE Arbitration Program Opt-Out Form by October 2, 2015 . . . . If you remain employed and do not timely complete, sign and submit an effective CARE Arbitration Program Opt-Out Form, the [f]irm's records will reflect that you have consented and agreed to the terms of the Arbitration Agreement and the arbitration provisions of the CARE Guidebook. You will not have an opportunity to opt out at a later date.

Importantly, should you choose to opt out of the Arbitration Agreement and CARE Arbitration Program, you will continue to be bound by the terms of any other arbitration agreement or obligation applicable to you. Your decision to opt out of the Arbitration Agreement and the CARE Arbitration Program will not adversely affect your employment status with the [f]irm.

If you have questions about the Arbitration Agreement or the arbitration provisions in the CARE Guidebook, email carebox@morganstanley.com.

Defendants argued plaintiff agreed to arbitration because she did not opt-out of the CARE Arbitration Program, her email did not send an out-of-the-

office reply when it received the CARE email, and plaintiff sent emails on September 2, 2015, around the time she received the CARE email, namely, at 2:41 p.m., 2:44 p.m., 3:30 p.m., and 4:29 p.m. In support of their motion, defendants filed a certification from the Morgan Stanley Executive Director and Global Head of End User Technology Operations, in which he explained that he "reviewed the metadata for the Jasicki CARE Email, which show that the Jasicki CARE Email was marked as 'read' in [plaintiff's] mailbox." He further certified as follows:

> Based on my review of Firm records, I can confirm that [plaintiff's] Exchange mailbox was working properly, operational and in use by [plaintiff] on September 2, 2015. Any of the following actions would have caused the Jasicki CARE Email to be marked as "read":
>
> a. [Plaintiff] selected the Jasicki CARE Email and then opened the Jasicki CARE Email for review;
>
> b. [Plainiff] selected the Jasicki CARE Email, which was displayed in the reading pane;
>
> c. [Plaintiff] selected the Jasicki CARE Email, and then made a selection to mark the Jasicki CARE Email as "Read"; or
>
> d. [Plaintiff] set up a rule within her Exchange mailbox to automatically mark emails as "read." Morgan Stanley located and collected a snapshot of [plaintiff's]

5

mailbox, which . . . shows that there are a number of emails [plaintiff] received on September 2, 2015 that are not marked "read." That fact indicates that [plaintiff] did not have a rule set up within her Exchange mailbox to automatically mark emails as "read" on that date.

Plaintiff's opposition to the motion argued there was no evidence she agreed to the CARE Arbitration Program and the mere receipt of an email was not enough to compel her to arbitrate her claims. She argued the disclaimers within the email rendered the agreement to arbitrate illusory and the email's reference to CARE as a part of Morgan Stanley's policies did not create an express or implied contract to arbitrate. She asserted she did not knowingly or voluntarily waive her right to a jury trial.

The motion judge granted defendants' motion. She noted there was no dispute plaintiff did not return the opt-out form and continued her employment past the October 2 deadline. The judge rejected plaintiff's argument the arbitration agreement was illusory noting the disclaimer language referred only to the "at-will employment relationship and makes clear that the agreement to arbitrate does not affect the at-will employment status." The judge further stated:

It is clear to the [c]ourt that . . . plaintiff received the e-mail. The e-mail was acknowledged in some form by having been marked as read.

The [c]ourt is satisfied with the certifications submitted in support of the contention that the method by which an e-mail is marked as read requires some action on the part of the plaintiff, and . . . therefore, the [c]ourt as far as the question of whether the e-mail was actually received by the plaintiff is put aside . . . .

The judge found there was an agreement to arbitrate, stating:

Reviewing the language of the e-mail in question here, the [c]ourt is satisfied that the e-mail clearly placed the plaintiff in this matter on notice, first that there was an expansion of the CARE arbitration program. On its face, the e-mail indicates that continued employment would certainly . . . constitute agreement to the arbitration agreement.

The face of the e-mail references the arbitration agreement. Although it does not provide the actual terms of the arbitration agreement, it does highlight the fact that the plaintiff is to review the arbitration agreement as well as review the CARE guidebook.

It indicates that it is important that the employee read and understand the arbitration agreement, and then it . . . actually . . . labels what the next steps would be.

And there, it indicates again that continued employment with Morgan Stanley would constitute an agreement to be bound by the terms of the agreement, and then it indicates that the employee can select to opt out by signing and submitting an arbitration opt-out form.

That creates a second step, a second level of assent. Not only does the employee have to continue employment, but the employee also must select not to sign an opt-out form.

And that satisfies the [c]ourt that that provides sufficient evidence . . . that the plaintiff assented and agreed to the terms of that arbitration agreement.

The plaintiff did not quarrel with the general principle that a failure to read the terms of the contract was not a defense.

On appeal, plaintiff argues there was no agreement to arbitrate because she did not execute an agreement and the motion judge erred by relying on metadata which noted the CARE email was marked as read to conclude plaintiff had agreed to arbitration. Plaintiff also argues the opt-out provision in the CARE email did not constitute assent to arbitrate her claims.

Our law strongly prefers the enforcement of arbitration agreements because "arbitration is [the] favored method of resolving disputes." Garfinkel v. Morristown Obstetrics & Gynecology Assocs., P.A., 168 N.J. 124, 131 (2001). Our review of the validity of an arbitration agreement and the legal determinations made by the trial court is de novo. Morgan v. Sanford Brown Inst., 225 N.J. 289, 302-03 (2016).

In determining whether parties have waived their right to resolution of their dispute before a court in favor of arbitration, we "cannot subject an

arbitration agreement to more burdensome requirements than those governing the formation of other contracts." Leodori v. Cigna Corp., 175 N.J. 293, 302 (2003). An arbitration "provision must reflect that an employee has agreed clearly and unambiguously to arbitrate the disputed claim. Generally, we determine a written agreement's validity by considering the intentions of the parties as reflected in the four corners of the written instrument." Ibid.

Employers and employees "may agree to arbitrate their disputes by referring generally to an arbitration policy contained in a separate writing, provided that the policy itself clearly reflects the employee's knowing and voluntary waiver of rights." Id. at 308. "'[A]n e-mail, properly couched, can be an appropriate medium for forming an arbitration agreement.'" Jaworski v. Ernst & Young, 441 N.J. Super. 464, 474 n.3 (App. Div. 2015) (quoting Campbell v. Gen. Dynamics Gov't Sys. Corp., 407 F.3d 546, 555-56 (1st Cir. 2005)).

"'[T]o enforce a waiver-of-rights provision[,] . . . the [c]ourt requires some concrete manifestation of the employee's intent as reflected in the text of the agreement itself.'" Leodori, 175 N.J. at 299 (quoting Garfinkel, 168 N.J. at 135). "Although not strictly required, a party's signature to an agreement is the customary and perhaps surest indication of assent." Leodori at 306-07. In the absence of a signature, a court should "not assume that employees intend to

9

waive [statutory] rights unless their agreements so provide in unambiguous terms." Id. at 301 (alteration in original) (quoting Garfinkel, 168 N.J. at 135). "[V]alid waiver[s] result[] only from an explicit, affirmative agreement that unmistakably reflects the employee's assent." Leodori at 303. Knowledge of the company's use of an arbitration program is not enough to signify intent to waive rights. Id. at 306. However, employers need not "negotiate individual agreements with their entire workforce to implement a companywide arbitration policy." Id. at 307. Rather, the policy may be effectuated through a signature or other explicit waiver of rights. Ibid.

"As a general rule, one who does not choose to read a contract before signing it cannot later relieve himself of its burdens. The onus [is] on plaintiff to obtain a copy of the contract in a timely manner to ascertain what rights it waived by beginning the arbitration process." Skuse v. Pfizer, Inc., 244 N.J. 30, 54 (2020) (internal quotations omitted) (quoting Riverside Chiropractic Grp. v. Mercury Ins. Co., 404 N.J. Super. 228, 238 (App. Div. 2008)).

In Skuse, our Supreme Court addressed the dissemination of an arbitration agreement in a context similar to the one presented here. There, Pfizer's human resources department emailed all employees announcing and linking its five-page Arbitration and Class Waiver Agreement. 244 N.J. at 38. The email stated,

"both [employees] and Pfizer agree that arbitration will replace state and federal courts as the place where certain employment disputes are ultimately decided, and that arbitrators will resolve the disputes, rather than judges or juries." Id. at 39 (internal citations omitted). Under the frequently asked questions (FAQs) section in the linked document, it stated employees must agree to the arbitration agreement if they wish to continue their employment, continuation of employment for sixty days constituted a contractual agreement, and employees should consult their own attorney for legal questions. Ibid. In bold, the email stated:

> You understand that your acknowledgement of this [a]greement is not required for the [a]greement to be enforced. If you begin or continue working for the [c]ompany sixty . . . days after receipt of this [a]greement, even without acknowledging this [a]greement, this [a]greement will be effective, and you will be deemed to have consented to, ratified and accepted this [a]greement through your acceptance of and/or continued employment with the [c]ompany.
>
> [Ibid.]

The same day it sent the email, Pfizer sent a second email containing an "assigned . . . activity" in the company's "module-based training program" on the agreement, indicating the training was important because the agreement was

a "condition of [their] employment." Id. at 40. The due date listed was the same as the effective date of the agreement. Ibid.

The training module included four slides. The first slide stated: "As a condition of your employment with Pfizer, you and Pfizer agree to individual arbitration as the exclusive means of resolving certain disputes relating to your employment." Ibid. The second stated: "Click the 'Resources' tab in the upper-right corner to review the Agreement [and] . . . print the Agreement and retain for your records." Ibid. The third stated:

> I understand that I must agree to the Mutual Arbitration and Class Waiver Agreement as a condition of my employment. Even if I do not click here, if I begin or continue working for the Company sixty . . . days after receipt of this Agreement, even without acknowledging this Agreement, this Agreement will be effective, and I will be deemed to have consented to, ratified and accepted this Agreement through my acceptance of and/or continued employment with the Company.
>
> [Id. at 41.]

Below this statement, "a box with an arrow pointing upward to that language instructed the employee to 'CLICK HERE to acknowledge.'" Ibid. The fourth slide thanked the employee for "reviewing" the agreement and provided an email for questions. Ibid.

Skuse was an active employee when Pfizer transmitted the emails and training module. Pfizer's records indicated she received all emails, and Pfizer sent her an email confirming she completed the training module approximately a month after receipt of the initial emails. Ibid. As a result, the trial court dismissed Skuse's employment discrimination complaint and compelled arbitration.

We reversed the trial court because we found the transmission of the arbitration agreement and training module by email was "'inadequate to substantiate an employee's knowing and unmistakable assent to arbitrate and waive his or her rights of access to the courts.'" Id. at 44. The Supreme Court noted our concerns that "employees who work in offices are inundated with incoming e-mails [and that we] took judicial notice that in order to deal with the volume of e-mails . . . they receive, people frequently skim (or scroll through without reading) written material sent to them digitally." Id. at 53 (internal quotations and citations omitted). The Court further noted that we "doubt[ed] . . . all . . . employees took the time to read the [a]greement linked to the module" because defendant utilized the term "assigning" the "training module . . . dilut[ing] the legal significance and necessary mutuality of the contractual process." Ibid. (internal quotations and citations omitted).

13

Notwithstanding these concerns, the Court reversed our decision and stated: "Even if Skuse were to contend that she did not review Pfizer's . . . e-mails and their attachments because of the volume of e-mails addressed to her[,] . . . her failure to review Pfizer's communications would not invalidate the [a]greement." Id. at 54. The Court concluded

> Pfizer's Agreement explained to Skuse in clear and unmistakable terms the rights that she would forego if she assented to arbitration by remaining employed . . . for sixty days. Although Pfizer's "training module" was not an optimal method of conveying to Skuse her employer's arbitration policy, Pfizer's . . . e-mails, the link to the Agreement contained in those e-mails, the "FAQs" page, and the summaries that appeared on the four pages collectively explained, with the clarity that our law requires, the terms of the Agreement to which Skuse agreed by virtue of her continued employment.
>
> [Id. at 61.]

Here, similar to Skuse, plaintiff does not dispute that she received the CARE email. The email subject line and its body unmistakably pertained to the CARE Arbitration Program. Contrary to plaintiff's argument, the outcome in Skuse did not turn on the multiplicity of communications sent by Pfizer. Rather, as the Skuse Court noted, an employee's failure to review the contents of an email does not invalidate an arbitration agreement. Moreover, arbitration was not unilaterally imposed; plaintiff had time to either opt out or, as in Skuse,

assent to arbitration by continuing to work for Morgan Stanley. For these reasons, we reject plaintiff's argument this dispute centers on metadata or that defendants were required to prove the extent to which she read the CARE email, beyond presenting objective evidence that she received the email, in order to compel arbitration of plaintiff's claims.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1629-19T1